IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SAMSUNG ELECTRONICS CO., LTD., SAMSUNG SEMICONDUCTOR, INC. and SAMSUNG ELECTRONICS AMERICA, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | C.A. No. _____ |
| v. | ) ) | **DEMAND FOR JURY TRIAL** |
| NETLIST, INC., | ) ) | |
| Defendant. | ) ) | |

**COMPLAINT FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT AND UNENFORCEABILITY; BREACH OF CONTRACT**

Plaintiffs Samsung Electronics Co., Ltd. ("SEC"), Samsung Semiconductor, Inc. ("SSI") and Samsung Electronics America, Inc. ("SEA," and together with SEC and SSI, "Samsung") seek a declaration that Samsung does not directly or indirectly infringe United States Patent No. 9,824,035 ("the '035 patent") (Exhibit 1), either literally or under the doctrine of equivalents; a declaration that the '035 patent is unenforceable due to inequitable conduct and unclean hands; and, alternatively, a ruling that Defendant Netlist, Inc. ("Netlist") has breached contractual obligations owed to Samsung, including obligations to license its allegedly essential '035 patent to Samsung and its affiliates on reasonable and non-discriminatory ("RAND") terms and conditions, as follows:

**NATURE OF THE ACTION**

1.      This is an action for a declaratory judgment arising under the patent laws of the United States, Title 35 of the United States Code, and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* and state contract law.

2.    This action arises out of Netlist's repeated assertions of patents against Samsung after Netlist unilaterally attempted to terminate an agreement in which Netlist granted Samsung a perpetual, paid-up, worldwide license to Netlist patents, including the '035 patent. Following Netlist's purported termination of the parties' license agreement, since 2021 Netlist has engaged in a multi-forum patent infringement campaign against Samsung. Recently, Netlist filed its latest action, a complaint with the International Trade Commission ("ITC") alleging that Samsung infringes numerous patents, including the '035 patent, and seeking an exclusion order for certain Samsung memory module products. In this action, Samsung seeks a declaratory judgment that it does not infringe the '035 patent and that the '035 patent is unenforceable due to inequitable conduct and unclean hands.

3.    Alternatively, Samsung seeks relief for Netlist's breaches of contractual obligations owed to Samsung, including obligations to license the '035 patent to Samsung and its affiliates on RAND terms and conditions. Netlist has insisted the '035 patent is necessarily infringed by the practice of certain standards promulgated by the Joint Electron Device Engineering Council ("JEDEC") and implemented by the Samsung memory modules at issue in this case.

## THE PARTIES

4.    Samsung Electronics Co., Ltd. is a corporation organized and existing under the laws of the Republic of Korea, with its principal place of business at 129, Samsung-ro, Yeongtong-gu, Suwon-si, Gyeonggi-do, 443-742, Republic of Korea.

5.    Samsung Semiconductor, Inc. is a corporation organized and existing under the laws of the State of California, with its principal place of business at 3655 North First Street, San Jose, California 95134.

6.     Samsung Electronics America, Inc. is a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 700 Sylvan Ave., Englewood Cliffs, New Jersey 07632.

7.     On information and belief, Netlist, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 175 Technology Drive, Suite 150, Irvine, California 92618.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over the claim for declaratory judgment of non-infringement and unenforceability (Counts I and III) under 28 U.S.C. §§ 1331, 1338(a), and 2201(a).

9.     This Court has subject matter jurisdiction over the breach of contract claim (Count II) pursuant to 28 U.S.C. § 1367. The breach of contract claim forms part of the same case or controversy as the claim for declaratory judgment of non-infringement asserted by Samsung in this action.

10.     This Court has personal jurisdiction over Netlist, a corporation organized and existing under the laws of the State of Delaware.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b)–(c) because Netlist is subject to personal jurisdiction in this District.

12.     An immediate, real, and justiciable controversy exists between Samsung and Netlist as to whether Samsung has infringed the '035 patent and whether the '035 patent is unenforceable.

### A.     Netlist's Assertion of the '035 Patent and Related Patent

13.     On September 30, 2025, Netlist filed a complaint with the ITC alleging that Samsung infringes six patents, including the '035 patent, related to dual in-line memory modules

("DIMM"), a type of dynamic random access memory ("DRAM"). Netlist's complaint accuses Samsung DDR5 multiplexed rank dual in-line memory modules ("MRDIMM") of infringing the '035 patent. The ITC has not yet instituted the investigation.

14. As described below, Netlist's ITC action followed Netlist's assertion against Samsung of a related patent, U.S. Patent No. 10,268,608 ("the '608 patent") in the Eastern District of Texas. *Netlist, Inc. v. Samsung Elecs. Co., Ltd. et al.*, No. 2:22-cv-293-JRG (E.D. Tex.) (the "EDTX II Action"). The '608 patent is a continuation of the '035 patent. On November 12, 2024, the Eastern District of Texas held a trial to determine whether, *inter alia*, Samsung infringed the '608 patent. The jury returned a verdict favorable to Netlist. *See* EDTX II Action, D.I. 847.

15. Netlist has also asserted the '035 and '608 patents against Samsung's competitor, Micron Technology Inc ("Micron"). On April 28, 2021, Netlist filed a complaint against Micron in the U.S. District Court for the Western District of Texas alleging infringement of the '035 and '608 patents. *Netlist, Inc. v. Micron Tech. Inc.*, C.A. No. 22-cv-00136, D.I. 1. On December 23, 2021, Micron filed a petition for *inter partes* review of the '035 patent, IPR2022-00236, and the Patent Trial and Appeal Board ("PTAB") ultimately found claims 1, 10–13, and 21–22 of the '035 patent unpatentable for obviousness. Netlist's case against Micron remains pending.

## B. Netlist's Notice of Infringement and Litigation Campaign Against Samsung and the Industry

16. In 2015, Netlist and SEC entered into a Joint Development and License Agreement (the "Agreement" or "JDLA"). The Agreement contains a patent cross-license provision, granting Samsung a license to Netlist's entire patent portfolio, including the '035 patent. On July 15, 2020, Netlist wrote to Samsung, alleging that Samsung had breached the Agreement

and stating that "Netlist is hereby terminating, effective immediately, the Agreement including the patent license granted to Samsung . . . ."

17.     After Netlist unilaterally declared that Samsung was no longer licensed to Netlist's patent portfolio, Netlist issued a "Notice of Infringement" letter to Samsung and subsequently began a years-long, multi-forum patent infringement litigation campaign against Samsung.

18.     Specifically, Netlist sued Samsung four times in the Eastern District of Texas on numerous patents related to memory modules. *See Netlist, Inc. v. Samsung Elecs. Co., Ltd. et al.*, No. 2:21-cv-463-JRG, D.I. (E.D. Tex.) (the "EDTX I Action"); *Netlist, Inc. v. Samsung Elecs. Co., Ltd. et al.*, No. 2:22-cv-293-JRG, D.I. 1 (E.D. Tex.) (the "EDTX II Action"); *Netlist, Inc. v. Samsung Elecs. Co., Ltd. et al.*, No. 2:25-cv-557-JRG, D.I. 1 (E.D. Tex.) ("the EDTX III Action"); *Netlist, Inc. v. Samsung Elecs. Co., Ltd. et al.*, No. 2:25-cv-748 (E.D. Tex.), D.I. 1 ("the EDTX IV Action").

19.     Netlist has also filed suit against Samsung in Germany, asserting two patents against some of the same products at issue in this case. *Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, Nos. 4c O 31/22, 4c O 45/22 (Düsseldorf Regional Court).

20.     Netlist has also sued numerous other memory module manufacturers or customers. For instance, from 2016 to 2020, Netlist asserted numerous patents in multiple forums in litigation against a competitor of Samsung, SK hynix. *Netlist, Inc. v. SK hynix America Inc. et al.*, No. 8:16-cv-1605 (C.D. Cal. 2016); *Netlist, Inc. v. SK hynix, Inc. et al.*, No. 8:17-cv-1030 (C.D. Cal. 2017); *In re Certain Memory Modules and Components Thereof, and Products Containing the Same*, No. 337-TA-1023 (U.S.I.T.C. 2016); *In re Certain Memory Modules and Components Thereof*, No. 337-TA-1089 (U.S.I.T.C. 2017); *Netlist, Inc. v. SK hynix Inc. et al.*,

No. 6:20-cv-194 (W.D. Tex. 2020); *Netlist, Inc. v. SK hynix America Inc. et al.*, No. 6:20-cv-525 (W.D. Tex. 2020).

21.    Netlist has also recently asserted patents in multiple litigations against Micron, which is a competitor of Samsung with respect to at least certain memory products. *Netlist, Inc. v. Micron Tech., Inc. et al.*, No. 6:21-cv-430 (W.D. Tex.); *Netlist, Inc. v. Micron Tech., Inc. et al.*, No. 6:21-cv-431 (W.D. Tex.); *Netlist, Inc. v. Micron Tech., Inc. et al.*, No. 2:22-cv-203-JRG (E.D. Tex.); *Netlist, Inc. v. Micron Tech., Inc. et al.*, No. 2:22-cv-294-JRG (E.D. Tex.). *Netlist, Inc. v. Micron Tech., Inc. et al.*, No. 2:25-cv-558-JRG (E.D. Tex.); *Netlist, Inc. v. Micron Tech., Inc. et al.*, No. 2:25-cv-749-JRG (E.D. Tex.); *Netlist, Inc. v. Micron Tech., Inc. et al.*, No. 2:25-cv-863-JRG (E.D. Tex.). Netlist also filed suit against Micron in Germany.

22.    Netlist has also filed infringement suits against Google in the Northern District of California, *Netlist, Inc. v. Google LLC*, No. 3:09-cv-05718-RS (N.D. Cal.), and in Germany. Netlist also named Google, along with Super Micro Computer, Inc., in the ITC complaint against Samsung.

**C.    Netlist's Threats of Future Infringement Actions**

23.    Furthermore, between May 2020 and the present, Netlist has made demands that Samsung take a second license to Netlist's portfolio of patents based on Netlist's claim that it terminated the fully paid-up, worldwide patent license granted in the Agreement.

24.    For instance, as noted above, on October 15, 2020, Netlist issued a "Notice of Infringement" to Samsung and demanded that Samsung take a second license to Netlist's patents. Specifically, Netlist demanded that "Samsung and its subsidiaries honor third-party intellectual property rights" and engage in "formal licensing discussions"—"reserv[ing] all rights and remedies" with respect to enforcing its patents against Samsung.

25.     On June 7, 2022, Netlist again demanded that Samsung take a second license to Netlist's patent portfolio. In the same correspondence, Netlist identified a number of Netlist patents that are, according to Netlist, essential to implement JEDEC standards and would require a license from Netlist for Netlist's entire DIMM patent portfolio. On information and belief, the DIMM patent portfolio to which Samsung will need another license, according to Netlist, includes the '035 patent.

26.     On June 4, 2023, Netlist again contacted Samsung, touting its broad patent portfolio and alleging that Netlist owns other patent that it had not yet asserted against Samsung that cover memory technologies. Netlist demanded that Samsung take a license to Netlist's entire patent portfolio; otherwise, according to Netlist, Samsung would be liable for future damages awards and penalties.

**\*\*\*\*\*\*\*\*\***

27.     Accordingly, as set forth herein, Netlist has sought to enforce the '035 patent and patents in the same patent family as the '035 patent against Samsung products currently being sold and used throughout the United States. Because this action presents an actual controversy with respect to the '035 patent, the Court may grant the declaratory relief sought pursuant to 28 U.S.C. § 2201 *et seq*.

## BACKGROUND

### A.    Netlist's Extraordinary License Demand and Infringement Threats

28.     As noted, on November 12, 2015, Netlist and SEC entered into the JDLA. The Agreement contains cross-license, joint development, and product supply provisions. In the Agreement, Netlist granted SEC and its subsidiaries, including SSI and SEA, a perpetual, paid-up, worldwide, non-exclusive license to all patents owned or controlled by Netlist or any of its

subsidiaries having an effective first filing date on or prior to November 12, 2020. The license extends through the expiration of the last to expire of the licensed patents.

29.     SEC similarly granted Netlist and its subsidiaries a perpetual, paid-up, worldwide, non-exclusive license to all patents owned or controlled by SEC or any of its subsidiaries having an effective first filing date on or prior to November 12, 2020.

30.     The Agreement required SEC to make a payment to Netlist of $8 million subject to the terms and conditions therein. SEC made this payment to Netlist, except for a portion that was remitted as tax withholding to the Korean tax authorities, which later refunded the withheld portion to Netlist.

31.     Since 2020, Netlist has taken extraordinary actions to back out of its grant of a patent license to Samsung.

32.     On May 27, 2020, Netlist's Chief Licensing Officer, Marc J. Frechette, wrote to Mr. Seung Min Sung of SEC and alleged that Samsung materially breached the Agreement by "repeatedly fail[ing] to fulfill Netlist's request for NAND and DRAM products throughout the term of the Agreement" and, allegedly, by improperly deducting withholding taxes. Netlist did not allege, and has never alleged, that Samsung breached the Agreement in any way related to the patent cross-license. In the same letter—which was the first time Netlist raised its breach allegations—Mr. Frechette informed Mr. Sung that Netlist had filed a complaint in U.S. District Court for the Central District of California with respect to the alleged breach by Samsung and provided a copy of the complaint for reference.

33.     On May 28, 2020, the U.S. District Court for the Central District of California docketed Netlist's breach of contract complaint against SEC. *Netlist Inc. v. Samsung Elecs. Co., Ltd.*, No. 8:20-cv-00993-MCS (C.D. Cal.) ("Breach Action").

34.    Netlist subsequently wrote to SEC to terminate the Agreement, including the patent license to SEC and its subsidiaries. On July 15, 2020, Netlist's Chief Licensing Officer, Marc J. Frechette, wrote to Mr. Seung Min Sung of SEC and stated that "Netlist is hereby terminating, effective immediately, the Agreement including the patent license granted to Samsung . . . ."

35.    One week later, on July 22, 2020, Netlist amended its complaint in the Breach Action, seeking a declaration that the license it granted Samsung, but not the license Samsung granted Netlist, was terminated. In the Breach Action, Netlist sought monetary damages and a declaration "that Netlist has terminated the Agreement pursuant to Section 13.2 and that Samsung's licenses and rights under the agreement have ceased."

36.    Netlist then issued a "Notice of Infringement" to Samsung and a demand that Samsung take a second license to Netlist's patents. Specifically, on October 15, 2020, Netlist stated that because it had terminated the Agreement, "Samsung is no longer licensed to any of Netlist's portfolio of patents." Netlist further asserted that its patents relate to DIMM products. Netlist then alleged: "Despite the termination of the Joint Development and License Agreement, Samsung continues to unlawfully utilize Netlist's innovations and to infringe Netlist's patents." Netlist concluded the letter by demanding that "Samsung and its subsidiaries honor third-party intellectual property rights" and engage in "formal licensing discussions." Netlist further stated that it "reserves all rights and remedies" with respect to the alleged infringement.

37.    Netlist resumed its communications with Samsung in 2021. On February 2, 2021, Netlist's Chief Licensing Counsel, Mr. Marc J. Frechette, indicated by email that Samsung must take a *second* license, coupled with the demand that Netlist "be made whole" for any alleged breach asserted in the Breach Action.

38.     Accordingly, Netlist seeks to double-dip, with a demand that Samsung take a second license to Netlist's patents.

39.     On October 14, 2021, the court in the Breach Action issued a confidential order granting summary judgment in favor of Netlist on Netlist's Third Claim for Relief, which sought a declaration that Netlist terminated Samsung's license effective July 20, 2020. *See Netlist Inc. v. Samsung Elecs. Co., Ltd.*, No. 8:20-cv-00993-MCS, D.I. 186 (C.D. Cal.). The court also granted summary judgment in Netlist's favor that Samsung was liable for certain alleged breaches of other provisions in the Agreement. *See id.*

40.     Beginning on December 1, 2021, the court in the Breach Action held a jury trial on damages for one of the alleged breaches, the alleged failure to fulfill Netlist's orders for NAND and DRAM products. On December 3, 2021, the jury returned a verdict in Samsung's favor, finding that Netlist failed to prove that it suffered any damages for this alleged breach. *See* Breach Action, D.I. 276. The court in the Breach Action concluded that Netlist was not entitled to damages for the remaining alleged breach (the withholding of taxes) as a matter of law and awarded to Netlist nominal damages of $1.00 for each alleged breach (for a total of $2.00). *Id.*, D.I. 306, ¶¶ 1–2.

41.     Despite losing at trial, Netlist issued a press release claiming to be "very pleased with the overall outcome of the case as it confirmed that Samsung no longer has a valid license to Netlist patents and therefore requires a licensing agreement." Netlist Provides Update on Action in Federal Court Against Samsung, https://investors.netlist.com/websites/netlist/ English/2120/us-press-release.html?airportNewsID=a661884d-0025-46ea-a055-bae8d8e4570b (last visited Nov. 1, 2025).

42.    SEC challenged the summary judgment ruling in the Breach Action on appeal to the Ninth Circuit. *Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, Nos. 22-55209 & 22-55247 (9th Cir.). SEC maintained that it did not breach the Agreement, that the Agreement has not been terminated, and that it continues to hold a paid-up, worldwide, non-exclusive license to Netlist's patents, including the '035 patent.

43.    The Ninth Circuit agreed that patent cross-licensing was a distinct aim of the JDLA, independent of the joint development project: "[T]he JDLA has two stated purposes: (1) developing a new NVDIMM-P product (i.e., the [joint development project]), and (2) patent cross-licensing. The title and preamble of the agreement exclusively reference these two topics, and each substantive section corresponds entirely to one of the two goals." D.I. 192, Ex. A at 3–4 (emphasis added). The Ninth Circuit remanded the case to (a) resolve an ambiguity in the supply provision in Section 6.2 of the JDLA and (b) determine whether any breach of that provision by Samsung was material such that Netlist could terminate the agreement. Following the Ninth Circuit's remand, a jury trial was held. On May 17, 2024, the jury issued its verdict, adopting Netlist's proffered meaning of the disputed provision and finding that Samsung's breach of that provision was material. *See* Breach Action, D.I. 556.

44.    In post-trial briefing, Samsung requested a new trial. The district court granted Samsung's motion on account of implied juror bias. *Id.*, D.I. 640 at 16.

45.    On March 24, 2025, the district court held a new trial, and the jury again adopted Netlist's proffered meaning of the disputed provision. See *id.*, D.I. 769. Samsung appealed the judgment to the United States Court of Appeals for the Ninth Circuit. *Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, No. 25-5531 (9th Cir.).

**B.      Netlist's Patent Infringement Lawsuits**

46.     Over the past decade, Netlist has pursued a litigation campaign against Samsung and other suppliers of memory modules, component suppliers, and users of memory modules (aside from Samsung).

**1.      Netlist's Lawsuits Against Samsung**

47.     As noted above, on October 15, 2021, Samsung filed a declaratory judgment action against Netlist in this District for a declaration that, *inter alia*, certain Samsung DIMM products did not infringe, *inter alia*, the patents that Netlist included in its "Notice of Infringement" letter. Delaware -1453 Litigation, D.I. 1. In particular, the complaint sought declarations of non-infringement with respect to United States Patent Nos. 10,217,523 (the "'523 patent"), 10,474,595 (the "'595 patent"), 9,858,218 (the "'218 patent"), and 7,619,912 (the "'912 patent"). *Id.* Netlist moved to dismiss Samsung's declaratory judgment claims, arguing that no case or controversy existed because there was no imminent threat of Netlist filing suit against Samsung on the patents-in-suit. *Id.*, D.I. 11 at 3–4. Samsung later amended its complaint, *id.*, D.I. 14, and Netlist moved to dismiss Samsung's First Amended Complaint, *id.*, D.I. 24.

48.     On August 1, 2022, the Court in the Delaware -1453 Litigation denied-in-part and granted-in-part Netlist's motion to dismiss Samsung's declaratory judgment claims. The Court found that it has jurisdiction on the patents included in the "Notice of Infringement" letter because, once the Central District of California granted summary judgment in favor of Netlist in the Breach Action, "Netlist's threats became more immediate." *Id.*, D.I. 37 at 4. However, the Court dismissed, *inter alia*, Samsung's declaratory judgment claim of non-infringement related to the '912 patent. *Id.*, D.I. 37. The Court reasoned that the patent had been "the subject of litigation in [the Northern District of California] for over a decade," so Samsung's declaratory judgment claim regarding that patent in Delaware was not "an efficient use of judicial resources." *Id.* at 6.

In reaching its decision, the Court accepted Netlist's argument that Samsung's "collateral action [in Delaware] should be dismissed in favor of the much more advanced Northern District case." *Id*. at 3; *see also id*., D.I. 11 at 3–5; D.I. 28 at 1–3, 8–10 (Netlist arguing that litigation on the '912 patent should proceed in the Northern District of California).

49.     Following the Court's order in the Delaware -1453 Litigation, Netlist counterclaimed against Samsung for infringement of all remaining patents. Netlist alleged that Samsung infringed the patents by making, using, selling, offering to sell, and/or importing DDR4 DIMM products. *Id.*, D.I. 40, ¶ 30. Netlist also sought treble damages based on Samsung's alleged willful infringement. *Id*., D.I. 45 ¶ 101. Netlist subsequently expanded its infringement allegations to include Samsung's DDR5 products. *Id*., D.I. 132-1, Ex. 16 at 2.

50.     Netlist later asserted counterclaims against Google in the Delaware -1453 Litigation for infringement of the same patents, *i.e.*, the '523, '595, and '218 patents. *Id.*, D.I. 45. Netlist's infringement allegations relate to Google's use of Samsung's DIMM products.

51.     On December 20, 2021, Netlist filed a lawsuit against SEC, SSI, and SEA in the Eastern District of Texas alleging direct and indirect infringement of three patents. EDTX I Action, D.I. 1. Netlist alleged that the defendants infringe in connection with the making, selling, using, and/or importing of DDR4 DIMM memory modules, *see id.* ¶¶ 40, 53, and DDR5 memory modules, *see id.* ¶ 68.

52.     Netlist filed the EDTX I Action the same day that it moved to dismiss the Delaware Litigation based on, *inter alia*, an alleged lack of any case or controversy over Samsung's declaratory judgment claims. *See* Delaware -1453 Litigation, D.I. 11 at 3 (arguing that the case did not involve a "substantial controversy of sufficient immediacy").

53.     Netlist also filed a second suit against Samsung in Texas. The same day the court in the Delaware -1453 Litigation dismissed Samsung's declaratory judgment claims involving the '912 patent—reasoning that litigating the patent in the Northern District of California would be the most efficient use of judicial resources—Netlist filed suit against Samsung on the '912 patent in the Eastern District of Texas. *See* EDTX II Action, D.I. 1. Netlist later amended its complaint to include three additional patents. Netlist alleged that Samsung infringed its patents by making, using, selling, offering to sell, and/or importing DDR4 DIMM memory modules. *Id.* ¶ 34.

54.     On May 19, 2025, Netlist filed a third infringement suit—the day before the patent-in-suit had issued from the U.S. Patent and Trademark Office ("Patent Office")—against Samsung in the Texas, asserting a continuation patent of two patents that Netlist asserted against Samsung in the EDTX I Action. *Netlist, Inc. v. Samsung Elecs. Co., Ltd. et al.*, No. 2:25-cv-553-JRG, D.I. 1 (E.D. Tex.). The next day, shortly after midnight, Netlist filed another infringement suit in the Eastern District of Texas, again alleging infringement of the same patent. EDTX III Action, D.I. 1 (E.D. Tex.). On July 8, 2025, Netlist filed an amended complaint in the EDTX III action, adding an additional patent and a Samsung distributor. *Id.*, D.I. 14.

55.     Similar to its complaint in the EDTX III Action, Netlist filed another infringement suit against Samsung seconds after the patent issued on July 29, 2025, at midnight EDT. EDTX IV Action, Dkt. 1.

56.     As noted, on September 30, 2025, Netlist filed a complaint with the ITC. Netlist seeks an exclusion order from the Commission related to Samsung's alleged infringement of six patents, including the '035 patent.

57.     Netlist also filed suit against Samsung in Germany, asserting two patents against Samsung's DDR4 DIMM memory modules. *Netlist, Inc. v. Samsung Elecs. Co., Ltd.*, Nos. 4c O 31/22, 4c O 45/22 (Düsseldorf Regional Court).

### 2.     Netlist's Lawsuits Against Third Parties

58.     Netlist has also pursued litigation campaigns against other suppliers of JEDEC standard-compliant memory modules, component suppliers, and users of memory modules. For instance, Netlist engaged in a years-long, multi-forum litigation campaign against SK hynix, a competitor of Samsung. Between 2016 and 2020, Netlist filed six patent infringement suits against SK hynix, the first two in the Central District of California. *See Netlist, Inc. v. SK hynix America Inc. et al.*, No. 8:16-cv-1605 (C.D. Cal. 2016); *Netlist, Inc. v. SK hynix, Inc. et al.*, No. 8:17-cv-1030 (C.D. Cal. 2017). Netlist also filed two complaints against SK hynix with the ITC. *See In re Certain Memory Modules and Components Thereof, and Products Containing the Same*, No. 337-TA-1023 (U.S.I.T.C. 2016); *In re Certain Memory Modules and Components Thereof*, No. 337-TA-1089 (U.S.I.T.C. 2017). Finally, Netlist filed two infringement suits against SK hynix in the Western District of Texas, *Netlist, Inc. v. SK hynix Inc. et al.*, No. 6:20-cv-194 (W.D. Tex. 2020); *Netlist, Inc. v. SK hynix America. et al.*, No. 6:20-cv-525 (W.D. Tex. 2020).

59.     In these suits, Netlist accused SK hynix DIMM memory modules of infringing certain Netlist patents.

60.     Netlist has also accused Google of infringing the '912 patent in connection with DDR4 DIMM products. *See Netlist, Inc. v. Google Inc.*, No. 3:09-cv-05718-RS (N.D. Cal.). Netlist seeks an injunction in that case, which would preclude Google from using the standard-compliant DIMM memory modules supplied by SSI to Google. Netlist also seeks an injunction against Google in the Delaware -1453 Litigation. D.I. 127 at 11.

61.    Netlist has also asserted the '912 patent against Inphi, a chip supplier. *See Netlist, Inc. v. Inphi Corp.*, No. 2:09-cv-6900 (C.D. Cal. 2009).

62.    As noted above, Netlist has also recently asserted patents in multiple litigations in Texas against Micron, which is a competitor of Samsung with respect to at least certain of the memory products at issue. In some of the Micron litigations, Netlist accuses the same type of memory modules at issue in this case.

**C.    Netlist's Standard Essential Allegations**

63.    As noted above, Netlist sued Micron in the Western District of Texas, alleging infringement of the '035 patent. *Netlist, Inc. v. Micron Tech. Inc.*, C.A. No. 22-cv-00136, D.I. 1. In that action, Netlist contended that the '035 patent was essential to JEDEC DIMM standards, alleging that "Netlist's innovative LRDIMM technology has since been adopted by JEDEC in its DDR4 LRDIMM standard that is used by companies throughout the industry." *Id.* ¶ 23. In other words, in its action against Micron, Netlist attempted to show infringement of the '035 patent by demonstrating that the JEDEC standard reads on the '035 patent and therefore Micron's standard-compliant products necessarily infringed. *Id.* ¶¶ 77–91.

64.    In the present action, Samsung seeks declarations that Samsung's DIMMs that comply with the DDR5 standards or any standard requiring materially similar functionality ("Samsung DDR5 DIMMs"), do not infringe the '035 patent.

65.    If, as Netlist contends, the '035 patent is essential to any of the JEDEC standards (which they are not), Netlist is obligated to license the patent on RAND terms. As discussed below, Netlist has failed to offer such a license to Samsung.

**D.    Overview of the '035 Patent**

66.    The '035 patent issued on November 21, 2017, from U.S. Application No. 15/426,064, which was filed on February 7, 2017. The '035 patent is a continuation of U.S.

Patent Application Ser. No. 14/846,993, to be issued as U.S. Patent No. 9,563,587, which is a continuation of U.S. Patent Application Ser. No. 13/952,599, filed Jul. 27, 2013, issued as U.S. Patent No. 9,128,632, which claims priority to U.S. Provisional Patent Application No. 61/676,883, filed on Jul. 27, 2012.

 67. The '035 patent relates to computer memory modules. '035 Patent 1:34–36. The disclosed memory module includes multiple memory devices 112, data buffers 118, and a module control device 116, shown in Figure 2C below:



 68. Module control device 116 is located at the center of memory module 110. Several memory devices 112 share a respective data buffer 118. *Id.*, 8:31–34. Figure 2C illustrates that data buffers 118 and their associated memory devices 112 are distributed across the memory module at varying distances from the module control device 116. These varying distances result in "unbalanced wire lengths" and different propagation delays—stated otherwise, control signals may take longer to reach farther away memory devices. *Id.*, 2:25–28. Conventional systems used "leveling mechanisms for write and/or read operations" in memory controllers to compensate for such delays. *Id.*, 2:25–28. The '035 patent alleges, however, that these techniques no longer accurately ensure "proper timing of the control and/or data signals received and/or transmitted by the memory modules." *Id.*, 2:28–33.

69.     The '035 patent purports to solve this alleged problem using a signal alignment circuit in each data buffer to determine transmission timing. *Id.*, 10:4–18, 15:14–21. Transmission timing is determined based on time information obtained from a prior write operation. *Id.* Using that timing information, the signal alignment circuit calculates the time interval for subsequent read operations. *Id.*

70.     For at least the reasons explained in Count I, Samsung DDR5 MRDIMMs ("the Samsung Memory Modules"), do not infringe the claims of the '035 patent.

### E.     Netlist Has Breached Contractual Obligations Owed to Samsung

#### 1.     JEDEC and Semiconductor Memory Standards

71.     JEDEC is an independent, non-profit semiconductor engineering trade association and standardization body based in the United States. Over 300 companies in the computer and electronics industries are currently members of JEDEC, including Samsung and Netlist.

72.     JEDEC has become the global leader in developing open standards and publications for a broad range of semiconductor technologies, including memory products. As relevant here, JEDEC develops standards for semiconductor memory chips and modules, including standards implemented by Samsung's products.

73.     JEDEC's semiconductor memory standards enable interoperability, *i.e.*, the ability of memory products made by different manufacturers to work together with computer and electronic devices made by others. JEDEC standards are widely implemented, and, for many types of semiconductor memory products, it is imperative that they comply with JEDEC standards in order to be commercially viable.

74.     Member companies participate in JEDEC's standard-setting process through over 50 committees and subcommittees that address various technological areas. Through

a collaborative process, members contribute to and vote on technical proposals for incorporation into JEDEC standards. Upon committee and board approval, new standards are promulgated and made available to the public.

75.    In some cases, JEDEC members own patents covering the technology they or others seek to have included in a JEDEC standard. A patent that includes a claim or claims that would necessarily be infringed by the use, sale, offer for sale, or disposition of a portion of a product in order to be compliant with an industry standard is referred to as a "standard essential patent" or an "SEP."

76.    Each owner of an SEP can, unless restrained, demand and obtain exorbitant royalties for the use of its patent, far in excess of the value, if any, that the patented technology would command had it not been incorporated into a standard. If unwilling to pay such excessive royalties, firms wishing to implement the standard face the risk of being foreclosed from using any portion of the standard, including unpatented and public domain technologies. This threat of foreclosure, if left unchecked, puts a manufacturer's investment in developing standard-compliant products at risk and, in effect, permits the possibility that the SEP holder may capture up to the value of the standard as a whole for each unique implementer, rather than the true value of its specific contribution to the standard, independent of the incorporation of the technology into the standard. The exploitation of SEPs to extract unreasonable or discriminatory royalties is referred to as patent "hold-up."

77.    The problem of "hold-up" is exacerbated in the context of standards, like those at issue here, as to which there are large numbers of SEPs and many different firms that claim to hold SEPs. The problem is likewise compounded when the products at issue, like those at

issue here, may be required to implement multiple standards. The resulting problem of excessive aggregate royalties is referred to as "royalty stacking."

78.    In order to mitigate these risks, JEDEC—like many other standard-setting organizations—has adopted a Patent Policy that seeks to ensure that owners of SEPs license those patents to manufacturers of standard-compliant products on RAND terms and conditions. Every firm that is a member of a JEDEC committee or a participant in a JEDEC committee meeting, including Netlist, agrees to abide by the JEDEC Patent Policy.

> *All Committee Members, as a condition of committee membership or committee Participation, agree to abide by JEDEC rules and procedures, including this JEDEC patent policy ("Patent Policy").*

Ex. 2 (JEDEC Manual No. 21T) § 8.2.2.1.

79.    Pursuant to the JEDEC Patent Policy, as a condition of committee membership or participation, all JEDEC committee members agree to disclose "Potentially Essential Patents" relevant to the work of the committee:

> *All Committee Members must Disclose Potentially Essential Patents, known to their Representative(s) to be Potentially Essential Patents that are owned or controlled by that Committee Member . . . .*

*Id.* § 8.2.3.

80.    The requirement to disclose "Potentially Essential Patents" extends to disclosing pending patent applications. *Id.* § 8.2.1.

81.    JEDEC committee members also agree to license "Essential Patent Claims" on RAND terms and conditions:

> *All Committee Members, as a condition of committee membership or committee Participation, agree to Disclose Potentially Essential Patents, as set forth more fully in 8.2.3, and to offer to license their Essential Patent Claims to all Potential Licensees on RAND terms and conditions, if and as consistent with 8.2.3 and 8.2.4.*

*Id.* § 8.2.2.1.

82.    JEDEC committee members also agree to license on RAND terms any "Essential Patent Claims" included in their patent applications:

> For any Essential Patent Claims held or controlled by the entity, *pending[,] or anticipated to be filed*, which are or may be required to implement a Standard that may result from the JEDEC Standard Activity, the entity hereby makes one of the following commitments: . . . A license will be offered . . . under reasonable terms and conditions that are free of any unfair discrimination.

*Id.* § 8.2.5 (emphasis added).

83.    The JEDEC Patent Policy defines "Potentially Essential Patent" as a patent that is reasonably believed to contain one or more Essential Patent Claims. *Id.* § 8.2.1. "Essential Patent Claim" is further defined as those "Patent claims the use of which would necessarily be infringed by the use, sale, offer for sale or other disposition of a portion of a product in order to be compliant with the required portions of a final approved JEDEC standard." *Id.*

84.    The JEDEC Patent Policy provides that the disclosure of Potentially Essential Patents "shall be made as early as reasonably possible" and documented by submission to JEDEC of either a "License Assurance/Disclosure Form" or a "Notice of Refusal." *Id.* § 8.2.3.

85.    A License Assurance/Disclosure Form (also known as a "Letter of Assurance" or "LOA") states that the committee member commits to license its SEPs to all potential licensees on RAND terms. On the contrary, a Notice of Refusal states that the member is not "willing to offer to license Essential Patent Claims . . . on RAND terms to all Potential Licensees." *Id.* § 8.2.3.1. In order to be effective, any such LOA or Notice of Refusal must be delivered to the JEDEC Legal Department within thirty (30) calendar days of a draft specification's completion. *Id.*

21

86.    Member companies who disclose and agree to license their patents on RAND terms do so via the aforementioned "LOA" identifying the relevant JEDEC standard(s) and making one of the two following commitments specified by the JEDEC Patent Policy:

> *For any Essential Patent Claims held or controlled by the entity, pending or anticipated to be filed, which are or may be required to implement a Standard that may result from the JEDEC Standard Activity, the entity hereby makes one of the following commitments:*
>
> *(i)    A license will be offered, without compensation, under reasonable terms and conditions that are free of any unfair discrimination to applicants desiring to utilize the license for the purpose of implementing the JEDEC Standard, subject to the terms and conditions in 8.2.4; or*
>
> *(ii)   A license will be offered, to applicants desiring to utilize the license for the purpose of implementing the JEDEC Standard under reasonable terms and conditions that are free of any unfair discrimination, subject to the terms and conditions in 8.2.4.*

*Id*. § 8.2.5.

87.    According to JEDEC's Patent Policy, disclosures and commitments with respect to one patent are deemed to include all patents claiming priority to the same filing. *Id*. § 8.2.1. Committee members are therefore obligated to license on RAND terms later-issuing SEPs that claim priority to patents disclosed to JEDEC.

88.    If a committee member who owns or controls patents essential (or potentially essential) to JEDEC standards does not disclose and agree to license them before the ballot closes, or notify the committee of an intention not to license through a "Notice of Refusal," the committee member will be deemed to have agreed to offer licenses on RAND terms:

> *If a Committee Member, at its discretion, elects not to submit a License Assurance/Disclosure Form (see Annex A.3) at or before the time the ballot closes and does not otherwise provide notice of an unwillingness to license in accordance with 8.2.3.1, the Committee Member and its Affiliates will be deemed to have agreed to offer to grant licenses on RAND terms and conditions for all of*

> *its Essential Patent Claims of the balloted Standard, if and as consistent with 8.2.4.*

*Id.* § 8.2.5.

89.     The JEDEC Patent Policy provides that it is to be interpreted and governed under the laws of the State of New York. *Id.* § 8.2.10. Although the JEDEC Manual 21 has been updated and amended from time to time, upon information and belief, all of the relevant provisions of the JEDEC Patent Policy have been materially the same at all times relevant hereto.

### 2.    Netlist's RAND Commitments

90.     Netlist alleges that it owns over 100 patents and patent applications related to memory technologies.

91.     Netlist is also a member of JEDEC and has joined a number of JEDEC technical committees over time. After years of membership in JEDEC, Netlist withdrew from membership in JEDEC briefly in 2011 after submitting Notices of Refusal for a number of Netlist patents. JEDEC reinstated Netlist later in 2011 following Netlist's submission of LOAs for the same patents Netlist had previously refused to license on RAND terms.

92.     Netlist again withdrew from membership in JEDEC committees JC-40, JC-42, and JC-45 in 2015, after submitting Notices of Refusal for many of its patents. In May 2018, Netlist requested from the JEDEC board of directors that Netlist be reinstated in those committees. The JEDEC board of directors approved the request on the condition that Netlist would agree to be bound by the JEDEC Patent Policy regarding work conducted in JC-40, JC-42, and JC-45 during the time Netlist had not participated in the committees, since and including February 27, 2015. Netlist agreed in writing to the JEDEC board of directors' terms, and JEDEC reinstated Netlist on August 14, 2018, retroactive to February 27, 2015.

93. Upon information and belief, therefore, at the time that the JEDEC standards were drafted and approved by JEDEC, Netlist was a member, attended the meetings, and/or was deemed a member of the JC-40, JC-42, and JC-45 committees that developed those standards.

94. To date, and on information and belief, Netlist has disclosed that at least 42 of its patents are essential or potentially essential to JEDEC standards.

95. Netlist is obligated to license the '035 patent on RAND terms to implementers of certain DDR4 and DDR5 standards, to the extent the '035 patent is essential to those standards. In fact, in its action against Micron related to the '035 patent, Netlist acknowledged that it had a duty to license the patent on RAND terms, noting that it had committed to license the '035 patent on RAND terms to implementers of JEDEC standards. *Netlist, Inc. v. Micron Technology Inc.*, C.A. No. 22-cv-00136, D.I. 1 ¶ 26 ("Netlist 'committed' the Asserted Patents to various JEDEC standards pursuant to the JEDEC Patent Policy, which sets certain obligations for owners of patents (like the Asserted Patents) that it reasonably believes are essential to one or more JEDEC standards," i.e., an obligation that "[a] license will be offered, to applicants desiring to utilize the license for the purpose of implementing the JEDEC Standard under reasonable terms and conditions that are free of any unfair discrimination . . . .").

96. Further, on information and belief, Netlist submitted a Letter of Assurance for U.S. Patent No. 9,128,632 ("the '632 patent") on April 7, 2016, related to JEDEC committee JC-40 and DDR4 LRDIMM and RDIMM components. The '035 patent is a continuation of the '632 patent. Therefore, under the JEDEC Patent Policy, the commitments in the '632 Letter of Assurance extend to the '035 patent. Ex. 2 (JEDEC Manual No. 21T) § 8.2.1.

97.    The commitments that Netlist has made to license its SEPs on RAND terms constitute binding contractual obligations that may be enforced by firms seeking to implement the JEDEC standards, such as Samsung.

### 3.    Netlist's Failure to Comply with Its RAND Obligations

98.    Although Netlist accepted the benefits of its membership in JEDEC to induce JEDEC to incorporate technologies over which Netlist claims to have patents into JEDEC standards, Netlist has failed to fulfill its corresponding contractual commitments. Despite voluntarily undertaking the obligation to license its alleged SEPs on RAND terms, Netlist has made licensing demands of Samsung that violate its RAND commitment.

99.    For instance, by email dated February 2, 2021, Netlist demanded that Samsung enter a second license to patents that Samsung previously licensed from Netlist, coupled with a demand to "be made whole" for any alleged breach under the Agreement. Specifically, Netlist stated that "Samsung will require a new license to our patent portfolio"—which would include the '035 patent—and requested "[d]amages that Netlist has incurred as a result of Samsung's material decrease of product supply to Netlist following Q1 2017 and how Netlist might be made whole."

100.    Further, Netlist has brought an ITC action against Samsung on the '035 patent, seeking an exclusion order from the Commission. Such an exclusion request, in addition to Netlist's failure to offer Samsung a license on RAND terms, violates Netlist's commitment to license its alleged SEPs on RAND terms and conditions.

101.    Accordingly, and as discussed elsewhere herein, Netlist has breached its obligations under the JEDEC Patent Policy.

## COUNT I
### (Declaration of Non-Infringement of the '035 Patent)

102.    Samsung restates and incorporates by reference the preceding paragraphs as if fully set forth herein.

103.    The Patent Office issued the '035 patent, titled "Memory Module with Timing-Controlled Data Paths in Distributed Data Buffers," on November 21, 2017. On information and belief, Netlist claims to own all rights, title, and interest in the '035 patent. A true and correct copy of the '035 patent is attached hereto as Exhibit 1.

104.    The '035 patent issued with 22 claims. In 2023, the PTAB determined that claims 1, 10–13, and 21–22 of the '035 patent are unpatentable for obviousness. *See* IPR2022-00236. Claim 1 reads as follows:

| Element | Claim Language |
|---|---|
| preamble | A memory module operable to communicate with a memory controller via a memory bus, the memory bus including signal lines, the signal lines including a set of control/address signal lines and a plurality of sets of data/strobe signal lines, the memory module comprising: |
| (a) | a module board having edge connections for coupling to respective signal lines in the memory bus; |
| (b) | a module control device mounted on the module board and configured to receive memory command signals for a first memory operation from the memory controller via the set of control/address signal lines and to output module command signals and module control signals in response to the memory command signals; and |
| (c) | memory devices mounted on the module board and configured to perform the first memory operation in response to the module command signals, the memory devices including a plurality of sets of memory devices corresponding to respective sets of the plurality of sets of data/strobe signal lines; and |
| (d) | a plurality of buffer circuits mounted on the module board in positions corresponding to respective sets of the plurality of sets of data/strobe signal lines, wherein each respective buffer circuit of the plurality of buffer circuits is coupled between a respective set of data/strobe signal lines and a respective set of memory devices, the each respective buffer circuit including data paths for transmitting respective data and strobe signals associated with the first memory operation and logic configured to respond to the module control signals by enabling the data paths, wherein the logic |

| Element | Claim Language |
|---------|----------------|
|  | is further configured to obtain timing information based on one or more signals received by the each respective buffer circuit during a second memory operation prior to the first memory operation and to control timing of the respective data and strobe signals on the data paths in accordance with the timing information. |

105.    Samsung has not directly or indirectly infringed any claim of the '035 patent, either literally or under the doctrine of equivalents, at least because the Samsung Memory Modules do not employ, incorporate, or otherwise make use of all of the limitations of the claim of the '035 patent.

106.    For example, claim 1 requires "wherein the logic is further configured to obtain timing information based on one or more signals received by the each respective buffer circuit during a second memory operation prior to the first memory operation … ." The Samsung Memory Modules do not satisfy the requirements of claim 1 for at least the reason that the alleged "timing information" is not obtained during a "second memory operation" because the timing information is set based on trainings that are not a "memory operation." For example, during MDQS Receive Enable (MRE) and MDQS Read Delay (MRD) training the data/strobe signal lines cannot be used to transmit data from the host controller to the memory devices or receive data from the memory devices in the memory modules and send it to the host controller.

107.    The Samsung Memory Modules do not infringe any of claims 2–22 at least because these claims depend directly or indirectly from claim 1.

108.    Samsung, its customers, and its end users are not liable for infringement of the '035 patent for any Samsung Memory Modules made, imported, or sold under license from Netlist.

109.    A substantial, immediate, and real controversy exists between Samsung and Netlist regarding whether Samsung or its customers or end users infringe the '035 patent by

making, using, selling, and/or offering for sale the Samsung Memory Modules in the United States, or by importing the Samsung Memory Modules into the United States. A judicial declaration is necessary to determine the parties' respective rights regarding the '035 patent.

110.    Samsung seeks a judgment declaring that Samsung and its customers and end users do not infringe the '035 patent, either literally or under the doctrine of equivalents, by making, using, selling, and/or offering for sale the Samsung Memory Modules in the United States, or by importing the Samsung Memory Modules into the United States, either directly under 35 U.S.C. § 271(a) or indirectly under 35 U.S.C. § 271(b)–(c).

## COUNT II
### (Alternative Claim for Breach of Contract)

111.    Samsung restates and incorporates by reference the preceding paragraphs as if fully set forth herein.

112.    In the alternative, if the JEDEC-compliant Samsung Memory Modules infringe any claim of the '035 patent, the '035 patent is a standard-essential patent, and Netlist has breached its contractual obligations to license any such patent claim to Samsung on RAND terms and conditions.

113.    Under the JEDEC Patent Policy, Netlist has a contractual commitment to offer implementers of the JEDEC standards, including Samsung, licenses to any Essential Patent Claims (as defined in the JEDEC Patent Policy) on RAND terms and conditions. This contractual commitment is on-going. Netlist continues to have an obligation to license its SEPs to Samsung on RAND terms, notwithstanding any breach of the Agreement or any termination of the license contained therein. Having entered the Agreement, Samsung showed that it is a willing licensee.

114.    Netlist has acknowledged in litigation that it has a RAND duty related to the '035 patent. Netlist also submitted a Letter of Assurance to the JC-40 committee in which

Netlist promised to make available to implementers of the DDR4 standards a license to the '632 patent "under reasonable terms and conditions that are demonstrably free of any unfair discrimination." Under the JEDEC Patent Policy, those commitments extend to the claims of the '035 patent, to the extent they are essential to the JEDEC standards.

115.    The JEDEC Patent Policy and/or Letters of Assurance constitute a valid and binding contract between Netlist and JEDEC.

116.    Samsung is a third-party beneficiary to the JEDEC Patent Policy and/or Letters of Assurance, and to Netlist's RAND obligations thereunder. Participation in JEDEC committees and the standard-setting process is expressly conditioned on a commitment to license essential patents to third-party implementers on RAND terms. Ex. 2 (JEDEC Manual No. 21T) § 8.2.2.1. The JEDEC Patent Policy is therefore intended to benefit third-party implementers of JEDEC standards, such as Samsung, and the obligations under the JEDEC Patent Policy, including the RAND obligations, are intended to be enforceable by third-party implementers of the JEDEC standards. Third-party implementers, such as Samsung, are also the only parties who could recover for Netlist's breach of its obligations under the JEDEC Patent Policy.

117.    Samsung has relied on the JEDEC Patent Policy and/or Letters of Assurance, including the RAND obligations set forth therein, in designing, manufacturing, and selling standard-compliant products, including the Samsung Memory Modules, and Samsung has supported the JEDEC standard based on its understanding and expectation that JEDEC members, including Netlist, will abide by their obligations.

118.    In ongoing litigation, Netlist and Samsung dispute whether Samsung has a license to Netlist's patents, including the '035 patent, under the Agreement. Netlist has taken the position that Samsung's license under the Agreement has been terminated, while Samsung

maintains that the termination was not effective and that it has a license to the '035 patent. As set forth above, Netlist has demanded that Samsung enter a second license to patents that Samsung previously licensed from Netlist, specifically demanding that because of the alleged JDLA termination "Samsung will require a new license to our patent portfolio," which would include the '035 patent.

119.    Although Netlist accepted the benefits of its membership in JEDEC, Netlist has failed to fulfill its corresponding contractual commitments. In particular, since the date of Netlist's purported termination of the JDLA to the present, Netlist has failed to offer Samsung a license to patents that Netlist alleges are essential to the JEDEC standards, including the '035 patent, on RAND terms and conditions. The licensing demands Netlist has made of Samsung, including in or around February 23, 2023, and June 4, 2023, violate its RAND commitment.

120.    If the data buffer and associated training modes required by JEDEC specifications, such as DRAM-to-DB Read Delay (MRD) Training Mode as defined in JESD82-32 for DDR4 and JESD82-521 for DDR5, infringe the '035 patent, then the patent is essential. To the extent the '035 patent is essential to any of the JEDEC standards, Netlist has breached its contractual obligations to license such patent to Samsung on RAND terms and conditions.

121.    As a result of Netlist's breaches of contract, Samsung has been injured in its business or property because it has been denied access to a license to Netlist's claimed SEP on RAND terms, a license that can only be obtained from Netlist. Netlist's conduct threatens Samsung with imminent loss of customers and potential customers, loss of goodwill and product image, loss of sales, litigation costs, uncertainty in business planning, and uncertainty among customers and potential customers.

## COUNT III
### (Declaration of Unenforceability of the '035 Patent Due to Inequitable Conduct & Unclean Hands)

122.    Samsung restates and incorporates by reference the preceding paragraphs as if fully set forth herein.

123.    On information and belief, at least the following people associated with Netlist were substantively involved in the prosecution of the application that issued as the '035 patent: Hyun Lee; Jayesh Bhakta; Gail Sasaki; and patent prosecution counsel Jamie Zheng (collectively "Netlist Individuals Substantively Involved in the '035 Patent Prosecution").

124.    Hyun Lee and Jayesh Bhakta are the named inventors of the '035 patent and signed oaths that were submitted with the application attesting to being the inventors of the alleged invention(s) claimed in the application.

125.    On information and belief, Gail Sasaki was, during the prosecution of the application that issued as the '035 patent, an employee and/or contractor for Netlist who signed the power of attorney for the application that issued as the '035 patent.

126.    Jamie Zheng is the prosecuting attorney for the application that issued as the '035 patent.

127.    On information and belief, each of the Netlist Individuals Substantively Involved in the '035 Patent Prosecution is an individual associated with the filing and prosecution of the application that issued as the '035 patent.

### A.    Netlist Attends JEDEC Meetings

128.    On information and belief Netlist representatives, including Hyun Lee, attended dozens of JEDEC meetings for years and listened to technological presentations from other JEDEC members. Then, Netlist incorporated key concepts from presentations that Netlist's

JEDEC representatives learned during meetings into the patent family that includes the '035 patent.

129.    For example, on information and belief, Mr. Hyun Lee, an inventor of the '035 patent, regularly attended JEDEC meetings for at least the JC-40 committee in 2011 and 2012, as well as before and after that timeframe, including the meetings occurring on December 8, 2011, in San Diego, California; on Mar. 5, 2012, in Hong Kong, China; and on June 4, 2012, in Washington, D.C. Similarly, Netlist regularly sent individuals to attend meetings for the JC-45 committee.

130.    During the December 8, 2011 JC-40 meeting in San Diego, JEDEC member Intel Corporation ("Intel") presented and discussed Committee Item Number 158.01 ("DDR4 LRDIMM Proposal"). On information and belief, the draft of Committee Item Number 158.01 was created by employees of Intel and circulated at or before, and discussed at, the JC-40 committee meeting on December 8, 2011, that Hyun Lee attended.

131.    Intel also presented two other items in subsequent JC-40 meetings in 2012, Committee Item Number 0311.14 ("Proposed DDR4 DB Training Modes") at the March 25, 2012 meeting and Committee Item Number 0311.12 ("Proposed DDR DB Buffer Control Words") at the June 4, 2012 meeting. On information and belief, drafts of Committee Item Number 0311.14 and Committee Item Number 0311.12 were created by employees of Intel and circulated at or before, and discussed at, the JC-40 committee meetings on March 5, 2012, and June 4, 2012, respectively, both of which Hyun Lee attended.

132.    On information and belief, and based on Netlist's alleged scope of the '035 patent, each of the JC-40 presentations, Committee Item Numbers 158.01, 0311.14, and 0311.12, disclose materially the same structure and functionality that Netlist has accused of infringing the

claims of the '035 patent. By virtue of his attendance at those meetings, active involvement in JEDEC and otherwise, on information and belief, Hyun Lee attended these presentations and was aware of their content.

133.    On information and belief, Hyun Lee shared JEDEC presentations with at least Jayesh Bhakta before the application that issued as the '035 patent was filed.

**B.    Prosecution of the '035 Patent**

134.    On information and belief, after attending the June 4, 2012 meeting and listening to these ideas from other members of JEDEC, Hyun Lee returned to Netlist's California office and hurriedly completed drafting the provisional application to which the '035 patent claims priority, naming himself as the inventor, and had U.S. Provisional App. No. 61/676,883 filed on July 27, 2012. Netlist filed a request to correct inventorship on September 26, 2012, adding Jay R. Bhakta as a co-inventor.

135.    Netlist filed the application, No. 15/426,064, which ultimately issued as the '035 patent, on Nov. 21, 2017.

136.    The inventors and others knew of these JEDEC presentations before the application that issued as the '035 patent was even filed. Netlist did not submit an information disclosure statement for the '035 patent. Netlist did not otherwise disclose these JEDEC presentations to the examiner.

**C.    Netlist Accuses Products that Implement the Disclosed Structures and Training Modes**

137.    Netlist subsequently attempted to claim LRDIMM training and similar concepts in the '035 patent that were disclosed in the Intel JC-40 presentations from 2011 and 2012, with Netlist claiming priority for these concepts to the provisional application filed on July 27, 2012. On information and belief, Netlist did not invent the full scope of the claims in the

'035 patent, as it represented to the Patent Office in its applications for those patents. Upon information and belief, Netlist simply took certain ideas about the function of LRDIMMs and other DIMMs from presentations that Mr. Hyun Lee, among other Netlist JEDEC representatives, attended as early as 2011.

138.    The JEDEC presentations are not cumulative of other art or information before the examiner of the application that issued as the '035 patent. For example, in a Final Written Decision for IPR2022-00236, the Patent Office relied on a combination of U.S. Patent Publication 2010/0312925A1 to Osani and U.S. Patent No. 8,020,022 to Tokuhiro to invalidate multiple claims of the '035 patent. In particular, Osani discloses a module structure that mirrors the structure disclosed in Committee Item Number 158.01.  Tokuhiro discloses JEDEC's DDR3 write leveling mechanism, which the Patent Office determined is a "second memory operation" as claimed in the '035 patent.

139.    The Patent Office would not have allowed at least one claim of the '035 patent to issue had it been aware of the JEDEC presentations and standards, at least because it would have found a claim obvious over that art, for similar reasons that it found the claims invalid in IPR2022-00236.

140.    On information and belief, Netlist Individuals Substantively Involved in the '035 Patent Prosecution, for instance at least Hyun Lee, recognized the materiality of that art and specifically intended to deceive the Patent Office into believing that the claims of the '035 patent are patentable by withholding that art from the examiner during prosecution of the application that issued as the '035 patent; and Netlist Individuals Substantively Involved in the '035 Patent Prosecution, for instance at least Jamie Zheng, specifically intended to deceive the Patent Office into believing that the claims of the '035 patent are patentable by foregoing presenting the pending

claims in the application to Hyun Lee and electing not to ask Hyun Lee for relevant, material art such as relevant JEDEC presentations, such that they could forego submitting such art to the examiner during prosecution of the application that issued as the '035 patent.

*    *    *    *

141.    Inequitable Conduct: Any one or more acts set forth above are sufficient in and of itself/themselves to demonstrate that Netlist committed inequitable conduct during the prosecution of the '035 patent that renders the '035 patent unenforceable.

142.    Unclean Hands: Furthermore, any one or more acts set forth above are sufficient in and of itself/themselves to demonstrate that Netlist has unclean hands in relation to its assertion of the '035 patent that renders the '035 patent unenforceable.

## JURY DEMAND

Samsung demands a jury trial on all issues and claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Samsung prays for judgment and relief as follows:

(a)    Declare that Samsung does not directly or indirectly infringe the '035 patent, either literally or under the doctrine of equivalents, and that it is not liable for damages or injunctive relief based on any claim in the '035 patent;

(b)    In the alternative, declare that Netlist is liable for breach of contract; and

(1)    Grant injunctive relief requiring that any Netlist demand that Samsung take a license to the '035 patent—to the extent the patent is found to be essential to the JEDEC standards—must be on reasonable terms and conditions that are demonstrably free from any unfair discrimination;

35

(2)     Enjoin Netlist from further demanding excessive, non-RAND royalties from Samsung for alleged infringement of the '035 patent;

(3)     Declare that Netlist is barred from seeking and/or enforcing injunctive relief against Samsung (including its affiliates) or its direct or indirect customers and end-users in any jurisdiction with respect to any alleged infringement of the '035 patent;

(4)     Enjoin Netlist from seeking and/or enforcing injunctive relief against Samsung (including its affiliates) or its direct or indirect customers and end users in any jurisdiction with respect to any alleged infringement of the '035 patent;

(5)     Compensate Samsung for all damages caused by Netlist's breaches of contract, including breaches of its RAND obligations;

(c)     Declare that the '035 patent is unenforceable due to inequitable conduct and/or unclean hands;

(d)     Declare that judgment be entered in favor of Samsung and against Netlist on Samsung's claims;

(e)     Find that this is an exceptional case under 35 U.S.C. § 285;

(f)     Award Samsung pre-judgment and post-judgment interest;

(g)     Award Samsung its costs and attorneys' fees in connection with this action; and

(h)     Such further and additional relief as the Court deems just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

_____

Rodger D. Smith II (#3778)
Anthony D. Raucci (#5948)
Ben Yenerall (#7132)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@morrisnichols.com
araucci@morrisnichols.com
byenerall@morrisnichols.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Brian Nester
Peter Swanson
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000

Thomas Garten
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
(415) 591-6000

November 11, 2025